Margaret AUSTIN, etc.,
Plaintiff, Appellant,

v.

RAYMARK INDUSTRIES, INC.,
Defendant, Appellee.

No. 87–1546.

United States Court of Appeals,
First Circuit.

Heard Jan. 6, 1988.

Decided March 11, 1988.

G. William Higbee with whom McTeague, Higbee, Libner, Reitman, MacAdam & Case, Topsham, Me., and David Gregory, Alfred, Me., were on brief, for plaintiff, appellant.

Mark G. Furey with whom Thomas R. McNaboe, Edward S. MacColl and Thompson, McNaboe, Ashley & Bull, Portland, Me., were on brief, for defendant, appellee.

Before CAMPBELL, Chief Judge, COFFIN and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

Blaine Austin, the husband of plaintiff-appellant Margaret Austin, died on October 13, 1977, from asbestos-induced cancer of the lung lining. The plaintiff brought suit in the United States District Court for the District of Maine against sixteen suppliers of asbestos products to Bath Iron Works, a shipbuilder, where her husband had worked from 1952 through 1976. During the course of the proceedings, the plaintiff entered into settlement agreements with all of the defendants except defendant-appellee Raymark Industries, Inc. (Raymark) and Unarco Industries, Inc. (Unarco). By

the time of trial the number of defendants had been winnowed down to seven. The jury returned an award under Maine's Wrongful Death and Survival statutes for $323,456.06. By special verdict the jury apportioned liability among four of the defendants as follows: Raymark, 9%; Johns–Manville Corporation (Johns–Manville), 22%; Unarco, 60%; and H.K. Porter Co., Inc./Southern Textile Co. (H.K. Porter), 9%.

The district court reduced the jury's award of damages by the amount of all the settlements. Because Unarco had gone into bankruptcy proceedings after the start of the lawsuit, the court also reallocated Unarco's percentage of liability among the other three defendants, and through the plaintiff's settlements with two of these defendants (Johns–Manville and H.K. Porter) to the plaintiff herself.

The plaintiff challenges both of the district court's actions. There are two basic issues before us: the interpretation of the settlement agreements; and the reallocation of Unarco's liability. We begin our review with the prior proceedings.

## I. THE PRIOR PROCEEDINGS

The plaintiff brought suit in the United States District Court for the District of Maine on June 14, 1978, against twelve suppliers of asbestos products to Bath Iron Works.[1] Her complaint alleged jurisdiction based on diversity of citizenship and causes of action under Maine law in negligence, strict products liability, and breach of warranty. On January 5, 1979, the plaintiff moved to amend the complaint to add four defendants,[2] a motion which the court granted on June 8, 1979. Two final defendants subsequently entered the action, one through consolidation of a separate complaint filed by the plaintiff on October 3, 1979, and another through a third-party complaint filed in the main action on June

---

1. These were Johns–Manville Products Corporation, Celotex Corporation, Unarco Industries, Inc., Nicolet Industries, Keene Building Products Corporation, Eagle–Picher Industries, Forty–Eight Insulations, Inc., G.A.F. Corporation, Armstrong Cork, Owens–Corning Fiberglas Corporation, Raybestos–Manhattan, Inc., and Pittsburgh Corning Corporation.

2. These were Amatex Corporation, Southern Textile Company, H.K. Porter Company, Inc., and J.P. Stevens & Company, Inc.

12, 1981.[3] The court allowed the plaintiff to dismiss voluntarily two of the defendants, thereby leaving sixteen in the case.[4]

Raymark filed a comprehensive cross-claim on August 7, 1981, against all of its codefendants for contribution and/or indemnity in an amount sufficient to reimburse Raymark for all or part of any judgment entered against it. Beginning in September 1981, the plaintiff entered into settlement agreements, called "Release and Indemnity Agreements," with twelve of the sixteen defendants.[5] Relying upon these agreements, the settling defendants moved for summary judgment on the cross-claims against them for contribution and/or indemnity. The court granted these motions, without objection from Raymark, Johns–Manville or Unarco, in a series of orders issued on September 30, 1981, October 19, 1981, October 30, 1981, and January 14, 1982.

The case went to trial on November 2, 1981, on the negligence, strict liability, and breach of warranty claims. The plaintiff and Johns–Manville settled under the same type of "Release and Indemnity Agreement" on November 23, 1981, and the court entered summary judgment for Johns–Manville and against all cross-claimants on January 25, 1982. During trial, the plaintiff dropped her breach of warranty claim, but requested that the strict liability claim be reserved, even though under Maine law it appeared that a claim in strict liability could not be based on products supplied before the effective date of Maine's strict liability statute, October 3, 1973. Finding insufficient evidence that either of the remaining defendants, Unarco or Raymark, had supplied asbestos to Bath Iron Works before that date, the court granted the defendants' motions for directed verdicts on both the breach of warranty and strict liability claims. After five weeks of trial,

the jury returned a verdict in favor of the defendants on the negligence claim. The court entered judgment for the defendants on December 8, 1981.

Plaintiff appealed to this court from the verdict and from a number of alleged errors in the proceedings below. While the appeal was pending, Unarco entered Chapter 11 bankruptcy proceedings in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division. This court stayed the appeal pending a final determination by the Bankruptcy Court, a determination subsequently issued on October 1, 1982, in which the Bankruptcy Court allowed the plaintiff to pursue her appeal against defendants other than Unarco. In that appeal, we first ruled that the plaintiff could maintain the action against the only remaining defendant, Raymark. We then vacated the judgment below in light of a change in Maine law allowing the application of strict liability to all injuries occurring after the effective date of the strict liability statute, regardless of the date on which the products were sold. Finally, we instructed the district court that on remand it was to certify to the Supreme Judicial Court of Maine the question of whether Maine's comparative negligence statute should apply to a claim based on strict liability. *See Austin v. Unarco Industries, Inc.,* 705 F.2d 1 (1st Cir.), *cert. dismissed,* 463 U.S. 1247, 104 S.Ct. 34, 77 L.Ed.2d 1454 (1983). In response, the Supreme Judicial Court of Maine answered in the affirmative. *See Austin v. Raybestos–Manhattan, Inc.,* 471 A.2d 280 (Me.1984). On July 13, 1984, the district court granted the plaintiff's motion for a new trial on the strict liability claim.

The new trial was divided into four phases. On March 15, 1985, the jury found Raymark strictly liable for causing Blaine

---

3. The plaintiff filed the separate complaint against Owens–Illinois, Inc.; H.K. Porter and Southern Textile filed the third-party complaint against Fibreboard Corporation.

4. Nicolet, Inc. was dismissed on January 17, 1980, and J.P. Stevens was dismissed on June 15, 1981.

5. Of the twelve agreements, one covered two defendants, H.K. Porter Company and Southern Textile Company. We will consider these two companies as one, and refer to them by the name of "H.K. Porter." The three defendants with whom the plaintiff did not settle by the start of trial were Johns–Manville, Unarco, and Raymark.

Austin's injury and subsequent death. On May 24, 1985, it awarded the plaintiff $323,456.06 in damages, of which $250,-457.11 comprised damages under Maine's Wrongful Death Act, and $72,998.95 under Maine's Survival Act. On June 18, 1985, the jury apportioned liability among four of the original defendants: Raymark, 9%; Johns–Manville, 22%; Unarco, 60%; and H.K. Porter, 9%.[6] And finally, on June 28, 1985, the jury denied the plaintiff punitive damages against Raymark.

The court entered judgment in two orders. In the first, issued on September 25, 1985, it reduced the award of $323,456.06 by all of the settlement amounts received by plaintiff except that in the case of Johns–Manville and H.K. Porter, it deducted either the settlement amount (Johns–Manville) or the amount equivalent to that company's proportionate liability (H.K. Porter), whichever was larger. The total reduction came to $279,611.05, leaving the plaintiff with a judgment for $43,845.01.[7] In the second order, issued on February 13, 1986, the court reallocated the percentage of liability assessed by the jury against the insolvent Unarco among the three remaining companies found liable. The reapportionment resulted in a finding of liability against Raymark at 22.5%; against Johns–

Manville at 55%; and against H.K. Porter at 22.5%.[8] The court then amended the September 25 order by deducting from the jury award of $323,456.06 an amount equivalent to the proportionate liability of Johns–Manville and H.K. Porter plus the sum of all the settlement amounts from the other settling defendants.[9] The plaintiff was left with a negative verdict of $102,-722.38, which the court adjusted to $0.00.

## II. THE OFFSET

The offset issue is whether, as plaintiff claims, the court erred in reducing the damage award by the amount of all settlement sums received, and not by the amount equivalent to the settling defendants' proportionate liability. The district court ruled that, in the absence of precise language stipulating as to how the court would reduce the damage award, the "record clearly shows ... that the understanding of the parties at the time of settlement was that there would be a setoff against the verdict of settlement amounts." With respect, we find that this reading of the record was clearly erroneous. Our reading of the record, including the settlement agreements, convinces us that the parties agreed to reduce the verdict by an amount equivalent to the proportionate lia-

6. The court found that only seven of the fifteen companies (counting H.K. Porter and Southern as one company) originally named as defendants could be potentially liable because only these seven supplied asbestos to Bath Iron Works. Of the seven, the jury determined that Blaine Austin was exposed to and did inhale asbestos products sold by six. The jury further determined that the four named companies sold asbestos that was defective and unreasonably dangerous and the proximate cause of Blaine Austin's death.

7. The breakdown of the offset was as follows: H.K. Porter, $29,111.05; Johns–Manville, $75,-000.00; Armstrong Cork, $4,000.00; Celotex, $17,500.00; Forty–Eight Insulations, $1,000.00; Owens–Corning, $60,000.00; Amatex, $8,000.00; Eagle–Picher, $4,000.00; Fibreboard, $6,000.00; G.A.F., $5,000.00; Keene, $25,000.00; Owens–Illinois, $10,000.00; Pittsburgh–Corning, $35,-000.00.

8. These figures result from a straightforward arithmetic computation. Originally, Raymark was found responsible at 9%, Johns–Manville at 22.5%, and H.K. Porter at 9%, for a total of 40% liability. Raymark's 9% represents 22.5% of the

40%; applying this 22.5% to Unarco's 60% means that Raymark absorbs an additional 13.5% of the verdict from Unarco's share, which when added to Raymark's original 9%, leaves Raymark responsible for 22.5% of the verdict. Similarly, Johns–Manville's original 22% represents 55% of the 40% for which the three defendants were liable; applying this 55% to Unarco's 60% means that Johns–Manville will absorb an additional 33% of the verdict from Unarco's share, which when added to Johns–Manville's original 22%, leaves Johns–Manville responsible for 55% of the verdict. The computations for H.K. Porter are exactly the same as those for Raymark.

9. The breakdown of the amended offset was as follows: H.K. Porter, $72,777.61; Johns–Manville, $177,900.83; Armstrong Cork, $4,000.00; Celotex, $17,500.00; Forty–Eight Insulations, $1,000.00; Owens–Corning, $60,000.00; Amatex, $8,000.00; Eagle–Picher, $4,000.00; Fibreboard, $6,000.00; G.A.F., $5,000.00; Keene, $25,000.00; Owens–Illinois, $10,000.00; Pittsburgh Corning, $35,000.00.

bility only of those defendants found at trial to be causally responsible for Blaine Austin's injury and subsequent death. This means that the verdict should not be reduced by the sum of the settlements made with defendants subsequently found not liable.

It is important at the outset to understand how the settlement procedure worked. The settlement proceedings took place in three distinct stages. In the first, the plaintiff signed a "Release and Indemnity Agreement" with each of the thirteen settling parties. Although the language used in these documents varied slightly, the basic aspects of the agreement were the same: the plaintiff agreed to (1) release and discharge her claims against the settling defendant while preserving her cause of action against the remaining defendants; (2) indemnify the settling defendant from all claims made by nonsettling defendants; and (3) release the nonsettling defendants from, and satisfy any future judgment for, that portion of the plaintiff's total damages for which the settling defendant was found to have been causally responsible. The settling defendants initiated the second stage of the settlement proceedings, when each filed a motion for summary judgment on all cross and third-party claims against it, supported by an affidavit of the settling defendant's attorney attesting to execution of the release and indemnity agreement with the plaintiff. In the third stage, the court entered an order granting summary judgment in favor of each of the settling defendants and mandating that the jury apportion liability among all of the defendants, including those that had settled.

*The Pierringer Releases*

Eight of the thirteen release and indemnity agreements explicitly stated:

WHEREAS, Releasor and Releasee have relied upon decisional law from jurisdictions other than the State of Maine in negotiating and framing this Release

and Indemnity Agreement, including specifically the law of the State of Wisconsin, as reflected in *Pierringer v. Hoger,* 21 Wis.2d 182, 124 N.W.2d 106 (Sup.Ct., Wis., 1963).

At the summary judgment hearing, the district court implicitly relied upon this provision by characterizing the release and indemnty agreements as *"Pierringer"* releases: [10]

The Court's understanding is that each of these defendants has settled with the plaintiffs in these various actions and has executed ... a so-called Pieringer [sic] release, the reference being to the form of release first approved by the Supreme Court of Wisconsin in *Pieringer* [sic] *v. Hoger,* 21 Wisconsin 2d 180 (124 Northwest 2d, 106, 1963).

The court then asked whether the motions for summary judgment made by the settling defendants could be granted

without objection, provided it was clearly understood that the Court would furnish the jury with special interrogatories which would require the jury to determine the proportionate fault of each defendant named in the case as well as those former defendants who are no longer parties to the case.

Counsel for Unarco responded by saying:

Let me just state for the benefit of the Court that counsel representing both groups, if we can use that term, of defendants who remain, that is, those who have not settled and those who have have met on a couple of occasions within the past few days to discuss this matter and to see if there is some common ground at least that will permit those defendants to come to the Court and say, "We would not contest this motion if an order setting forth certain basic ground rules were signed by the Court." So I guess the sentiments [expressed by the Court] are in essence correct. That is,

---

**10.** We do not find it important that five of the release and indemnity agreements did not refer to *Pierringer v. Hoger,* 21 Wis.2d 182, 124 N.W. 2d 106 (1963). All of the agreements contained the same basic components, a uniformity that the court below recognized by treating them as

intending the same effect. We agree with the district court on this point, and will treat the agreements similarly, attributing to all of them the reliance upon *Pierringer* and the other cases discussed herein.

that there may not be objection if it is certain at least to those defendants that remain that what we understand to be the effect of *Pieringer* [sic] will be implemented by the Court.

From this, it is clear that all of the parties to the summary judgment proceeding—the plaintiff, the settling defendants and the nonsettling defendants—understood that the court would grant the summary judgment orders in reliance upon *Pierringer v. Hoger*, 21 Wis.2d 182, 124 N.W. 2d 106 (1963).

We, therefore, must determine what a *Pierringer* release is and what its scope and effects are. And specifically, does such a release anticipate a reduction in the verdict by the amount of the settlements made with defendants later found not liable? In *Pierringer*, the plaintiff in a tort action settled with all but one defendant before trial. The settling defendants then made a motion before trial to dismiss the cross-complaints for contribution filed against them by the one remaining defendant. The trial court granted the settling defendants' motions, from which the nonsettling defendant appealed. The Supreme Court of Wisconsin ruled that the releases executed by the plaintiff preserved the plaintiff's cause of action against the nonsettling defendant, while barring the nonsettling defendant's right to contribution from the settling defendant. Central to the court's reasoning was the fact that the releases satisfied a part of the cause of action against the nonsettling defendant in an amount equivalent to the settling defendants' proportionate liability. The court wrote that the

> instant releases contemplate [the] issue of allocation as binding upon the plaintiff because *he has satisfied that part of his cause of action for which liability is found to be attributable to the settling tort-feasors.* The issue between the plaintiff and the nonsettling defendant ... is the percentage of causal negligence, if any, of the nonsettling defendant, but such percentage of negligence can only be determined by a proper allocation of all the causal negligence, if any, of all the joint tort-feasors and of the

plaintiff if contributory negligence is involved.... [The settling parties need not] remain parties because the allocation, if any, of the causal negligence to the settling tort-feasors is merely a part of the mechanics by which the percentage of causal negligence of the nonsettling tort-feasor is determined. It makes no practical difference to the settling tort-feasors what percentage of causal negligence is allocated to them because they have bought their peace in any event.

*Pierringer*, 124 N.W.2d at 111–12 (emphasis added).

In *Pierringer*, the Wisconsin court found that the nonsettling defendant effectively obtained its contribution from the settling defendants by having assessed against it *only its own percentage of liability.* See *Peiffer v. Allstate Insurance Co.*, 51 Wis. 2d 329, 187 N.W.2d 182, 185 (1971) (in a *Pierringer* release, "since the plaintiff is limited in recovery to the unsatisfied percentage of the damages—the percentage attributable to the nonsettling tort-feasor— there is to be no payment sought beyond the non-settling tort-feasor's share"). Seen another way, *Pierringer* means that the amount collected from a nonsettling defendant will represent the full award offset by the amount equivalent to the percentage of liability allocated to the settling defendants.

In addition to relying upon *Pierringer*, three of the eight releases also relied upon *Fietzer v. Ford Motor Co.*, 383 F.Supp. 33 (E.D.Wis.1974), an action in diversity which itself relied upon *Pierringer*. And five of the eight relied upon the law of Wyoming, as reflected in *Bd. of County Comm'rs v. Ridenour*, 623 P.2d 1174 (Wyo.1981), the law of Minnesota, as reflected in *Frey v. Snelgrove*, 269 N.W.2d 918 (Minn.1978), and the law of North Dakota, as reflected in *Bartels v. City of Williston*, 276 N.W.2d 113 (N.D.1979). All of these cases hold implicitly or explicitly that under a *Pierringer* agreement a nonsettling defendant will pay the part of the award representing

its proportionate share of the verdict.[11]

*Bartels* in particular provides strong evidence on this point. In *Bartels*, a United States District Court certified to the Supreme Court of North Dakota the question, *inter alia*, of whether the court should reduce the damage award in a negligence action by the amount of settlement or by the amount equivalent to the percentage of negligence attributed to the released tortfeasors. Relying upon and explicitly adopting the principle set forth in *Pierringer*, the court answered that the latter was the appropriate amount. The court went so far as to say that the enactment of North Dakota's comparative negligence act, adopted in reliance upon the Wisconsin case law reflected in *Pierringer*, impliedly repealed North Dakota's joint tortfeasor contribution act to read as follows:

> [A release or covenant not to sue] does not discharge any of the other tort-feasors from liability ... but it reduces the claim against the others to the extent of the *relative degree of fault (percentage of negligence) attributable to the released joint tort-feasors.*

*Bartels*, 276 N.W.2d at 116, 121 (emphasis in original).

We have looked at every case in which the parties made use of a *Pierringer* release, and have found no court construing such release to require an offset against the verdict of the settlement amounts. In fact, every court directly confronted with the question of whether to reduce a damage award by the amount of settlement secured pursuant to a *Pierringer* release, or by the amount equivalent to the settling defendant's proportionate liability, has ruled in favor of deducting the latter sum. *See Johnson v. Rogers*, 621 F.2d 300, 302–04 (8th Cir.1980); *McDonough v. Van Eerden*, 650 F.Supp. 78 (E.D.Wis.1986); *Shantz v. Richview, Inc.*, 311 N.W.2d 155 (Minn.1981); *cf. Green v. United States*, 709 F.2d 1158, 1164–66 (7th Cir.1983) (in a federal tort claims action arising in Wisconsin and applying *Pierringer*, plaintiff was allowed to recover the amount by which the settlement exceeded the amount equivalent to the settling defendant's proportionate liability); *Cartel Capital Corp. v. Fireco of New Jersey*, 81 N.J. 548, 410 A.2d 674, 685 (1980) ("When one defendant settles, the remaining codefendant or codefendants are chargeable with the total verdict less that attributable to the settling defendant's percentage share.") (relying upon *Bartels*, *Frey*, and *Pierringer*).

The Supreme Court of Minnesota explained why in *Shantz v. Richview, Inc.*, 311 N.W.2d 155. The plaintiff in that case had used a *Pierringer* release to settle before trial with a third-party defendant. Although the jury found that the settling defendant was not liable, the trial court deducted the settlement from the verdict, and the plaintiff appealed. Holding that the theory behind a *Pierringer* release is that "the nonsettling defendant will only be liable for his percentage share, if any, of the total damages determined by the jury," the court concluded that the "nonsettling party [was] not entitled to have the amount paid by the settling party subtracted from the damages he is required to pay the plaintiff." *Shantz*, 311 N.W.2d at 156. The court explained that

> [i]t should be no concern of the nonsettling defendant how much the plaintiff received from the settling defendant—in some cases ... plaintiff will have made the better bargain; in others, the settling defendant will have made the better bargain. In either case, all that should concern the nonsettling defendant is that he not be required to pay more than his percentage share of the total damages which the jury determines the plaintiff sustained.

*Id.*[12]

The *Shantz* ruling shows how *Pierringer* releases equitably distribute the risks of

---

**11.** *See Fietzer*, 383 F.Supp. at 35–36; *Ridenour*, 623 P.2d at 1188–92; *Frey*, 269 N.W.2d at 920–22; *Bartels*, 276 N.W.2d at 119.

**12.** We note that the *Shantz* ruling came out of Minnesota, a state upon whose decisional law the release and indemnity agreements relied, and built upon *Frey v. Snelgrove*, 269 N.W.2d 918 (Minn.1978), a case upon which the agreements specifically relied.

settlement among the parties. If the settlement turns out to be greater than the amount equivalent to the proportionate liability of the settling defendant, then the plaintiff, in effect, will have made a good bargain. Conversely, if the settlement turns out to be less than this sum, then the plaintiff will have made a bad bargain. In either case, the nonsettling defendant's position is the same: it will only pay its fair share of the verdict. *Cf. Gomes v. Brodhurst*, 394 F.2d 465, 468 (3d Cir.1968) (Coffin, J.) (on petition for rehearing) ("[negligence system] which taxes non-settling tortfeasors to the extent of their negligence, and no further, is the more equitable").

■ A *Pierringer* agreement, therefore, provides a specific procedure for settlement that insures a benefit for each party to the action. The plaintiff gives up her cause of action against the settling defendants in return for a sure sum and the assurance that she will be able to maintain her action against parties not released; the settling defendant gives up the opportunity to establish its nonliability in return for the security of being completely removed from the action; and finally, the nonsettling defendant obtains the assurance that its claims for contribution against the settling defendants will be determined at trial when the jury apportions liability among all of the defendants.

### The Intent of the Parties

■ If the parties understood the scope and effect of a *Pierringer* release and intended that they be bound by it, there can be no question that only the amount equivalent to the settling defendants' proportionate liability should have been deducted from the verdict. It is difficult to perceive how experienced and knowledgeable attorneys would embrace a doctrine that they neither understood nor intended. But we will examine the record to see if the parties used the words "*Pierringer* release" while in fact agreeing to something contrary to the *Pierringer* doctrine.

■ The language of the release and indemnity agreements themselves is the primary indicator of the parties' intent. All thirteen agreements contain the following language, with minor variations:

> Releasor also agrees to satisfy any future judgment that may be rendered in favor of Releasor, in such fraction, portion or percentage of the judgment as the causal fault of Releasee is adjudged to be of all causal fault of all persons adjudged liable to Releasor.

This provision conclusively establishes the parties' agreement to "satisfy" the damage award in an amount equivalent to the percentage of the judgment attributed to the "causal fault" of the settling defendants. There can be no mistaking the meaning of the term "satisfy" in this context; it means "offset" or "reduce."

Raymark asserts, in contrast, that the parties agreed to reduce the verdict by the amount of all settlements. It bases much of its argument on the following exchange, which took place immediately after the parties agreed that the settling defendants were moving for summary judgment in reliance upon the *Pierringer* releases. The court noted that its understanding of the settlement procedure ratified in *Pierringer* was that

> an interrogatory would be presented to the jury which would require them to determine the relative fault of both the defendants in the case and any defendants who have previously settled and if, for example, the jury's determination was that a defendant who had settled was 20% responsible and the damages awarded were, we'll say, $100,000, there would be a $20,000 credit. The plaintiff would not recover $20,000 and the plaintiff would recover the $80,000 from those defendants who are still a party.
>
> [Counsel for Unarco]: That's correct. There would be a set-off to the amount paid. In other words, if their liability was less than what they were [sic] paid and as I understand it, we are entitled to a set-off to the amount they have paid....
>
> The Court: Now, wait a minute, wait a minute. This is something new, at least new to me.

[Counsel for Unarco]: I think under Maine law the defendants who remain in a case are entitled to a credit to the amounts paid to a plaintiff. That plaintiff is being compensated for an injury. If the jury determines that that injury entitles that plaintiff to $100,000 and $20,000 has been paid, then those defendants in the case are entitled to a credit to the extent of $20,000 which has been paid to the plaintiff to compensate the plaintiff for his or her injury. Now we may be discussing something that is not germane—

The Court: Is this Maine law?

[Counsel for Unarco]: Yes, it is.

The Court: Mr. Higbee, do you accept this?

[Counsel for Plaintiff]: I agree with that. My understanding is after the jury comes back with a verdict, the Judge reduces the settlement, the verdict, by the amount of the settlement.

This exchange is confusing. There are two offset figures under consideration: the settlement amount and the amount equivalent to the proportionate liability of the settling defendant. The court suggests that under *Pierringer,* the latter is the appropriate offset, and Unarco agrees. Then Unarco suggests that under Maine law the former is the appropriate offset, and the plaintiff agrees. Heightening the confusion is that the example used to illustrate the application of both offsets is the same: $20,000.

We do not think that these remarks amounted to an agreement to reduce the verdict by the settlement amounts irrespective of the settling parties' liability. There are three reasons. First, it is obvious that both the court and the parties were not anticipating deducting any amount from the verdict unless a settling defendant were found liable. Unarco claimed that there should be an offset of the settlement "if [the settling defendants'] *liability* was less than what they were [sic] paid." Tak-

ing this statement at face value, we can only conclude that Unarco was assuming a result in which there was *some* finding of liability; it is stretching the statement's meaning too far to infer from it that Unarco meant to encompass within the phrase "if their liability was less than what they were [sic] paid" the additional phrase "or if they were absolved of any liability."

Second, Unarco's invocation of Maine law does not comport with the release and indemnity agreements, in which the parties expressly disavowed any reliance upon Maine law. The agreements stated that the "[r]eleasor and [r]eleasee have relied upon decisional law from jurisdictions *other than the State of Maine* in negotiating and framing this Release and Indemnity Agreement, including specifically the law of [Wisconsin, Minnesota, and North Dakota]." (Emphasis added). The summary judgment orders, in turn, relied upon these agreements, referring to them as "Pierringer" releases. We can only conclude therefore that all of the parties to the orders—including Raymark—understood that they were not relying upon Maine law. Moreover, Raymark's position is inconsistent: on the one hand, it argues that Maine law "does not apply where [as here] the parties have agreed to an alternative method of crediting or setting-off settlements"; and, on the other hand, it attempts to explain what that "alternative method" was by pointing to a discussion in which the parties refer to Maine law.

Third, even assuming that the parties were attempting to modify the *Pierringer* release by agreeing to an offset in conformity with Maine law, Maine law at the time was anything but clear on how the court would determine the amount of this offset. Under Me.Rev.Stat.Ann. tit. 14, § 163 (1980), a trial court could reduce the verdict against a nonsettling defendant by an amount equal to the settlements, but it was uncertain whether this reduction would apply if the settling defendants were ultimately adjudged nonliable.[13] In fact,

**13.** Since then, the Supreme Judicial Court of Maine has clarified this point by holding, in *Thurston v. 3K Kamper Ko. Inc.,* 482 A.2d 837 (Me.1984), that "section 163 contemplates that a verdict not be reduced by the amount of settlements with parties who the verdict declares are without causative fault." *Id.* at 842. In an attempt to bring herself within this holding, the

the only clear aspect of Maine law at the time strongly suggested that section 163 applied only in situations in which there was no apportionment of fault among both the nonsettling and settling parties. When there was such an apportionment, *Packard v. Whitten,* 274 A.2d 169 (Me.1971), held that all joint tortfeasors should pay their proportionate share. It explained: "We see no reason why in logic or in justice the law should expect that the joint tort-feasor should ultimately be required to contribute more—*or less*—than a share of the total damages proportionate to his causal fault." *Id.* at 180 (emphasis added).[14]

The offhand reference to Maine law is not sufficient to contradict the language of the releases. If the parties truly meant to rely upon Maine law in determining the amount of the offset, they would have so specified clearly.

In contrast to the inconclusive exchange relied upon by Raymark, other comments made during the summary judgment hearing provide clear evidence of the parties' intent to reduce the verdict by an amount equivalent to the settling defendants' proportionate liability. At one point the court asked counsel for Unarco what "protection" it wanted before allowing summary judgment to be entered against it. Counsel responded by saying

> What I am interested in is making sure that if this case goes to trial, that the liability, the fault of those settling defendants, will be considered by a jury and that my client will only be responsible for its proportionate share of the fault of the non-settling defendants.... That is, not only will there be a settlement of liability, but by virtue of this release, *the dollar value of that liability will be reduced from the total verdict*

*for which my client may share a part of the responsibility.*

(Emphasis added). At another point, counsel for Armstrong Cork, one of the settling defendants, remarked, without objection by either Raymark or Unarco, that the

> only reason that the *Pieringer* [sic] release is effectuated and the way it is effectuated is it requires the plaintiff to reduce the amount of his recovery against a non-settling defendant by the amount equal to the percentage of responsibility attributable to the settling defendants.

And at yet another point in the proceedings, Raymark expressed its concern that summary judgment be granted against it only if the remaining defendants could "put in evidence against the defendants who are settled out, so that the jury has a basis upon which to apportion fault."

There is one final comment. In discussing what might happen on appeal, the court said to plaintiff's counsel:

> [I]t seems to me appropriate that the jury's determination with respect to the particular settled defendant be on the record. There may well be appeals of one type or another. In fact, you yourself as plaintiff may wish to appeal a finding that a non-settling defendant was at fault in some percentage and it would be in your interest to have specified the extent to which that defendant is at fault.... [A]ssume the jury finds $100,-000 damages. Assume it finds UNARCO, who is a defendant, 60% at fault and finds Amatex 20% at fault and Armstrong World 20% at fault. *Judgment would then be entered for $60,000 against UNARCO.* If you feel there is not sufficient evidence to present to the jury that Armstrong World was at fault and if the Court should agree, that would

---

plaintiff claims that the parties did agree to rely upon Maine law, and that Maine law at the time clearly meant what *Thurston* subsequently declared. We reject this attempt to rely upon Maine law, when the release and indemnity agreements so clearly disavow any such reliance.

**14.** Since *Packard,* the Supreme Judicial Court of Maine has reaffirmed this principle by consist-

ently holding that nonsettling defendants must pay their proportionate share of the verdict. *See Clockedile v. Town of Yarmouth,* 520 A.2d 1075 (Me.1987); *Dongo v. Banks,* 448 A.2d 885 (Me.1982); *cf. Lavoie v. Celotex Corp.,* 505 A.2d 481, 483 (Me.1986) (under a *Pierringer* arrangement, "the proportional fault of the dismissed defendants still must be decided at trial") (citation omitted).

come out of the picture and *you would be receiving more from UNARCO.* I would think you would like to know that. (Emphasis added). By this comment, the court not only confirmed that the parties agreed to reduce the verdict by the amount equivalent to the proportionate liability of a settling defendant such as Armstrong, but indicated also that the parties anticipated *adding to* the verdict any amount determined upon appeal to be incorrectly deducted. If, as Raymark claims, the settlement of Armstrong was to be deducted from the verdict irrespective of Armstrong's liability, then the court would not have insisted, on the plaintiff's behalf, in making the findings as to the liability of each settling defendant a part of the record. The plaintiff would not have been able to recover more from Unarco in any event.

Raymark claims that "the whole purpose of establishing a 'Pierringer' type settlement was to obtain a resolution of liability on cross-claims among the defendants." It is hard to reconcile this position with Raymark's other claim that its concern throughout the settlement proceedings was that it "have the ability to set-off amounts paid in settlement against a damage verdict regardless of the settled defendants' liability." The reason for "resolving" the question of liability among joint tortfeasors is to establish a basis for one tortfeasor's claim for contribution against another. If Raymark simply wanted to reduce the verdict by the settlement amounts, irrespective of the settling defendants' liability, then it seems unlikely that it would have insisted upon a summary judgment order specifically mandating the apportionment of liability.[15] In fact, it would have been unlikely, if not simply pointless, for the parties to have relied upon *Pierringer* at

all; the plaintiff could have released and indemnified the settling defendants, thereby leaving open the question of whether and to what degree these defendants were responsible for the injury.

■ The only other basis for Raymark's claim—in addition to the reference to Maine law during the summary judgment hearing—is language in four of the release and indemnity agreements. In particular, Raymark claims that the following provision demonstrates that the parties agreed to an offset equal to the settlement amounts, irrespective of the settling defendants' liability:

> Releasor hereby credits and satisfies [an amount equal to the settlement amount] of the total damages and injuries sustained by Releasor ... and further credits and satisfies that portion of the total amount of the damages and injuries sustained by Releasor that were caused by the causal fault, if any, of the Releasee.

We find this language too murky to give to it the binding effect that Raymark urges. Read literally, it would allow a reduction of the verdict by *two* amounts: the settlement and the equivalent of the settling defendant's proportionate liability. It strains credulity to believe that the plaintiff agreed to reduce her verdict so drastically. Moreover, in the same documents containing the above language, the plaintiff agreed to "satisfy any future judgment that may be rendered in favor of [her], in such fraction, portion or percentage of the judgment as the causal fault of [the settling defendant] is adjudged to be of all causal fault of all persons adjudged liable to [the plaintiff]." This language—which appears not only in four but in all thirteen of the release and indemnity agreements— is determinative. With it, the plaintiff

---

**15.** In all of the orders granting summary judgment in favor of the settling defendants, the court granted summary judgment "[u]pon consideration of the affidavits of counsel and of the so-called 'Pierringer' releases." In these same orders, the court mandated that

> evidence may be offered on the issue of the fault of the dismissed Defendants and special interrogatories shall be submitted to the jury pursuant to F.R.Civ.P. 49 for the purpose of determining the respective percentages of

fault contributed by each of the foregoing dismissed Defendants.

In two of the affidavits referred to by the court, the attorney attested that by the terms of the release and indemnity agreement, "the non settling defendants may still achieve *a percentage reduction of any amount of responsibility allocated to [the settling defendant]*, without the necessity of [the settling defendant's] being a party to the case any longer." (Emphasis added).

demonstrated in precise terms her intent to reduce the verdict by the amount equivalent to the settling defendants' proportionate liability. She reaffirmed this intent by referring in eight agreements to *Pierringer*. And Raymark signaled its willingness to abide by the terms of the release and indemnity agreements by agreeing to summary judgment orders issued in reliance upon them only if the orders mandated jury apportionment of the settling defendants' liability.

We summarize the factors that compel our conclusion that the district court clearly erred in reducing the verdict by the settlement amounts.

(1) All of the parties agreed that *Pierringer* releases were the settlement instruments; under a *Pierringer* release, only the amount equivalent to the settling defendants' proportionate liability is deducted from the verdict.

(2) The wording of the releases and the record of the summary judgment proceedings show the intent of the parties to follow the *Pierringer* doctrine.

(3) The settlement procedure tracked the *Pierringer* format: a release and indemnity agreement by the plaintiff with each settling defendant; and court orders which (a) granted summary judgment in favor of each settling defendant against all cross and third-party claims; and (b) mandated that the jury determine the respective percentages of fault contributed by each settling defendant.

(4) A special verdict form was submitted to the jury under which it was asked to determine the proportionate liability of seven companies, five of whom had settled with plaintiff. The jury was instructed that the total of the proportionate liability found should be 100%.

## III. REALLOCATING UNARCO'S LIABILITY

The second issue is whether the court erred in reallocating the percentage of liability from the insolvent defendant Unarco to the other defendants found at fault, and through the plaintiff's settlement with two of them, to the plaintiff herself. We need not devote a great deal of discussion to this question, because we believe that the court followed an equitable rule, explicitly endorsed by a number of states and implicitly supported by the law of Maine.

The jury found Unarco liable for 60% of the injury. But Unarco is in Chapter 11 bankruptcy proceedings, so the plaintiff cannot collect from Unarco any part of this sum. The question presented in such a circumstance is whether to place the burden of Unarco's insolvency on the plaintiff or the solvent defendants. Reasoning that "Raymark, as the only defendant remaining ..., is liable under the doctrine of joint and several liability for the entire amount of [the plaintiff's judgment], including the [amount] for which the jury has found ... Unarco causally responsible," (citing Me. Rev.Stat.Ann. tit. 14, § 156 (1980)), the court resolved this initial question in the plaintiff's favor. The court went on to point out that because all claims against Unarco had been stayed by the bankruptcy court, Raymark was precluded from obtaining contribution from Unarco for Unarco's proportion of liability. To insure that Raymark would not pay more than its fair share, the court distributed the 60% of the verdict attributable to Unarco proportionately among the solvent defendants, including the two that had settled with the plaintiff through *Pierringer* releases, Johns–Manville and H.K. Porter.[16] Raymark absorbed 22.5% (9/40ths) of this 60%, or an additional 13.5% of the verdict, which when added to the 9% liability found by the jury increased Raymark's share of the verdict to 22.5%.

There is, as the court observed, "substantial and persuasive authority" supporting the redistribution of the liability of an insolvent or immune tortfeasor among the remaining tortfeasors in direct proportion

---

**16.** The plaintiff reached a settlement with Johns–Manville before Manville filed for Chapter 11 relief. Although Manville's share of the verdict was also "uncollectible" as a consequence, this share had already been "satisfied" through settlement. The court, therefore, only reallocated Unarco's share.

to their respective degrees of fault. *See Larsen v. Wisconsin Power & Light Co.,* 120 Wis.2d 508, 355 N.W.2d 557, 563–64 (Ct.App.1984); *Paradise Valley Hospital v. Schlossman,* 143 Cal.App.3d 87, 191 Cal. Rptr. 531 (1983); *cf. Judson v. Peoples Bank & Trust Co.,* 17 N.J. 67, 110 A.2d 24, 37 (1954); *see also Restatement (Second) of Torts* § 886A comment i (1979); *Restatement of Restitution* § 85 comment h (1937 & Supp.1986–87); 1 S. Speiser, C. Krause, & A. Gans, *The American Law of Torts* §§ 3:12, 3:24, at 417–18, 476–77 (1983 & Supp.1988). There is less substantial but still persuasive authority supporting this redistribution even among tortfeasors that are protected through settlement from having to pay for any of the redistributed liability. *See Hosley v. Armstrong Cork Co.,* 383 N.W.2d 289 (Minn.1986); *accord Frederickson v. Alton M. Johnson Co.,* 402 N.W.2d 794 (Minn.1987); *cf. Ambriz v. Kress,* 148 Cal.App.3d 963, 196 Cal.Rptr. 417 (1983); *but see Hoerr v. Northfield Foundry and Mach. Co.,* 376 N.W.2d 323, 328–35 (N.D.1985); *Chart v. General Motors Corp.,* 258 N.W.2d 680, 687–88 (Wis. 1977).

 We see no reason for endorsing redistribution in the former case and not in the latter. By reallocating the uncollectible award proportionately among those who could pay, the court effectively accommodated two equally powerful principles of Maine tort law: that the plaintiff collect the full damage award through operation of the rule of joint and several liability; and that each joint tortfeasor pay its proportionate share of the verdict through operation of the rule of comparative negligence. *See* Me.Rev.Stat.Ann. tit. 14, § 156 (1980).[17] All of the parties bore the shortfall caused by the insolvency of Unarco in a proportion reflecting their percentage of the verdict. The reallocation only *seemed* to deprive the plaintiff of a part of her award because she had agreed to "satisfy" any contribution claims made against two

of the defendants, Johns–Manville and H.K. Porter, which together absorbed 77.5% (31/40ths) of Unarco's share. The plaintiff agreed to "stand in the shoes" of Johns–Manville and H.K. Porter; in so doing, she must be held responsible for their portion of any uncollectible obligations. *See Hosley,* 383 N.W.2d at 294.

*Conclusion*

We hold that the proper offset, which gives full effect to the intent of the parties, is the amount equivalent to the proportionate liability of the settling defendants. Because two of the settling defendants, Johns–Manville and H.K. Porter, were found liable for 22% and 9% of the verdict, respectively, the verdict must be reduced by 31%. Unarco, which was found liable for 60% of the verdict, cannot pay because it is in Chapter 11 bankruptcy proceedings. As the district court held, Unarco's share must be proportionately reallocated among Johns–Manville, H.K. Porter, and Raymark. Raymark, therefore, which before reallocation was liable for 9% of the verdict, will absorb 22.5% (9/40ths) of Unarco's share, *see* footnote 8 supra, thereby increasing its liability to 22.5% of the $323,-456.06 verdict, or $72,777.61.

*Reversed in part, affirmed in part, and remanded.*

No costs.

---

**17.** Section 156 provides in relevant part that [i]n a case involving multi-party defendants, each defendant shall be *joint and severally liable to the plaintiff for the full amount of the plaintiff's damages.* However, any defendant shall have the right through the use of special interrogatories to request of the jury *the percentage of fault contributed by each defendant.* (Emphasis added).