ALUMAX MILL PRODUCTS, INC., Appellee,

v.

CONGRESS FINANCIAL CORPORATION; Congress Financial Corporation–Midwest; Appellants,

Hodroff & Novotny, Appellee.

HODROFF & NOVOTNY, Appellee,

v.

McGLADREY, HENDRICKSON & PULLEN, Appellee.

No. 89–5014.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 11, 1989.

Decided Aug. 31, 1990.

J. Michael Schwartz, Minneapolis, Minn., for appellants.

David T. Erie, Chicago, Ill., and David E. Kendall, Washington, D.C., for appellee McGladrey, Hendrickson & Pullen.

Before McMILLIAN, Circuit Judge, SNEED,[*] Senior Circuit Judge, and WOLLMAN, Circuit Judge.

McMILLIAN, Circuit Judge.

Congress Financial Corp. and its wholly-owned subsidiary, Congress Financial Corp.–Midwest (hereinafter jointly referred to as Congress), appeal from an order entered in the District Court[1] for the District of Minnesota approving a settlement agreement between Alumax Mill Products, Inc. (Alumax), and two accounting firms, McGladrey & Pullen, formerly McGladrey, Hendrickson & Pullen (McGladrey), and Hodroff & Novotny (Hodroff). *Alumax Mill Products, Inc. v. Congress Financial Corp.*, No. 3–86–Civil–146 (D.Minn. Nov. 8, 1988) (dismissal and judgment). The district court directed entry of a partial final judgment pursuant to Fed.R.Civ.P. 54(b). For reversal Congress argues the district court erred in approving the settlement agreement between Alumax and the two accounting firms because the settlement agreement is unfair and prejudicial to Congress. For the reasons discussed below, we affirm in part, vacate in part and remand the case to the district court with

---

[*] The Honorable Joseph T. Sneed, Senior United States Circuit Judge for the Ninth Circuit, sitting by designation.

1. The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

directions to dismiss Alumax's claims against McGladrey for lack of jurisdiction.

This appeal involves the collapse of a Minnesota aluminum fabrication company, Northern Aluminum Co. (Northern). Northern molded and formed aluminum into siding and other building products. Alumax was one of Northern's suppliers of rolled and sheet aluminum. In March 1984 Northern approached Congress for a loan. Congress is a financial factor; it lends money to companies based on the value of the company's sales and inventory. In April 1984 Congress reviewed Northern's 1981 and 1982 certified financial statements, which had been prepared by McGladrey, and Northern's 1983 certified financial statement, which had been completed by Hodroff, and made a detailed analysis of Northern's financial status. McGladrey worked on but did not complete the 1983 audit, and Hodroff relied on McGladrey's work to complete the 1983 audit. In June 1984 Congress loaned Northern over $6 million secured by Northern's inventory and accounts receivable.

According to Alumax, Congress discovered in July 1984 that Northern had been engaged in a form of fraud known as "pre-billing." Pre-billing occurs when the borrower (Northern) receives an order, prepares the original and a copy of the invoice for the order, and sends the invoice to the asset-based lender (Congress) in order to borrow on its accounts receivable line of credit before the goods are shipped. Pre-billing inflates the borrower's accounts receivable. The borrower draws on its line of credit, which is secured by its accounts receivable, before the product has been shipped and before the customer is obligated to pay for the product, that is, before there is a corresponding account receivable.

Alumax alleged that Congress then assumed effective control of Northern's operations and, even though Congress knew Northern was bankrupt, continued to operate Northern in order to reduce Northern's indebtedness to Congress but at the expense of Northern's other creditors, including Alumax. According to Alumax, Congress concealed the fraud at Northern through the summer and fall of 1984. Between July and October 1984 Alumax shipped aluminum products worth $734,-536.33 to Northern. Northern has not paid Alumax for these products. Alumax asserted that it did not discover Northern's true financial condition or the extent of Congress's involvement in Northern's operations until October 26, 1984, when one of its employees made an unannounced visit and confronted Congress representatives in Northern's offices. Alumax also alleged that during the summer of 1984 McGladrey and Hodroff learned of the pre-billing scheme but failed to revise the financial statements they had prepared for Northern. Alumax alleged that it relied on the financial statements prepared by McGladrey and Hodroff in deciding to continue to supply aluminum products to Northern during the summer and fall of 1984.

According to Congress, although it suspected as early as the summer of 1984 that Northern was engaged in "pre-billing," it did not in fact discover the pre-billing scheme until September 1984 when William "Chip" Goldwasser II, Northern's president, described in an affidavit the nature and scope of the pre-billing scheme at Northern. Goldwasser admitted pre-billing over $2.25 million in fiscal 1984. Congress also discovered false and forged records at Northern. Also during this period, but unknown to Congress, a Hodroff auditor discovered that Northern had maintained a second set of shipping records which documented false sales. By the end of November 1984, Congress had discovered additional evidence of commercial fraud at Northern. Congress then stopped lending any additional funds to Northern and turned over the information it had discovered to federal authorities. Goldwasser eventually pled guilty to seven counts of mail and wire fraud and was sentenced to seven years imprisonment.

In January 1985 Northern declared bankruptcy. Congress asserted that it lost over $6 million as a result of its loan to Northern.

FEDERAL LAWSUIT FILED BY CONGRESS

In November 1985 Congress filed a lawsuit in federal court against McGladrey, Northern's accountants until 1983, and Hodroff, McGladrey's accounting successor at Northern and Northern's accountants after 1983. The complaint asserted federal racketeering violations (Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 (RICO)) and state law claims for accounting malpractice, negligent misrepresentation and fraud. According to Congress, employees of McGladrey and Anderson & Sieberlich, McGladrey's accounting predecessor at Northern, had discovered evidence of fraud in Northern's accounts receivable and inventory as early as 1979. Congress alleged that there were material discrepancies in Northern's accounts receivable and inventory for each of the years audited by McGladrey and that McGladrey improperly resolved the discrepancies by either accepting the representations of Northern employees or ignoring the discrepancies.

As noted above, McGladrey worked on but did not complete the 1983 Northern audit. Congress alleged that, shortly before McGladrey withdrew from the 1983 audit, Northern employees admitted certain financial irregularities to McGladrey. Congress alleged McGladrey covered up the financial irregularities and allowed Hodroff to undertake and complete the 1983 audit without informing Hodroff of the financial irregularities and without withdrawing any of its earlier, unqualified audit opinions. Hodroff completed the 1983 audit on the basis of McGladrey's inventory work and without confirming the accounts receivable for 1983. According to Congress, although Hodroff discovered substantial discrepancies that should have required significant audit adjustments, Hodroff nonetheless issued an unqualified opinion on Northern's 1983 financial statements.

Congress further alleged that, during the 1984 audit, Hodroff discovered additional discrepancies in Northern's accounts payable, including a fictitious customer and forged accounts receivable and accounts payable confirmations to that company. Hodroff confronted Northern's management in July 1984. Goldwasser admitted that he had been engaged in pre-billing and turned over to Hodroff certain documents that indicated that some $2.5 million in accounts receivable had been pre-billed during fiscal 1984. Congress alleged that Hodroff failed to inform Congress of these discoveries and instead attributed the delay in completing Northern's 1984 audit report to the illness of Northern's accountant. According to Congress, Hodroff provided Congress with Northern's interim financial statements for the first quarter of fiscal 1984 even though Hodroff knew that those statements would be substantially affected by the pre-billing scheme.

In June 1987 McGladrey filed a motion for summary judgment on the RICO claims, asserting that there was no RICO violation because there was no pattern of racketeering activity. The district court agreed and granted summary judgment in favor of McGladrey on the RICO claims and dismissed the remaining state law claims for lack of jurisdiction. Congress appealed. We held the appeal in abeyance pending the Supreme Court's decision in *H.J. Inc. v. Northwestern Bell Telephone Co.,* — U.S. ——, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), *rev'g* 829 F.2d 648 (8th Cir.1987). We then reversed and remanded the case to the district court for reconsideration in light of the Supreme Court's decision. *Congress Financial Corp. v. McGladrey, Hendrickson & Pullen,* 902 F.2d 1571 (8th Cir.1990) (order).

In the meantime, in March 1988, following the district court's dismissal, Congress filed a lawsuit against McGladrey and Hodroff in state court, alleging conspiracy, accounting malpractice, and negligent misrepresentation and fraud. *Congress Financial Corp. v. McGladrey, Hendrickson & Pullen,* No. 88–04137 (Minn.Dist.Ct.).

FEDERAL LAWSUIT FILED BY ALUMAX

In February 1986 Alumax filed this lawsuit in federal court against Congress and Hodroff. Alumax essentially alleged that Congress and Northern conspired to de-

fraud it of over $750,000. Alumax charged Congress with RICO violations and with state law claims for fraud, liability as Northern's agent, and breach of fiduciary duty. Alumax charged Hodroff with state law claims of negligence and fraud. Hodroff later filed a third-party complaint for indemnification or contribution against McGladrey. In its second amended complaint, Alumax also charged McGladrey with negligence and fraud. Congress filed cross-claims for contribution or indemnity, or both, against McGladrey and Hodroff; Congress alleged that, like Alumax, it was the victim of the fraudulent misconduct of Northern and accounting malpractice by McGladrey and Hodroff. McGladrey and Hodroff filed cross-claims for indemnity or contribution, or both, against each other and Congress. Congress also filed a counterclaim against Alumax, alleging that in 1984 Alumax knew Northern was having serious financial difficulties and fraudulently concealed this information from Congress. According to Congress, Alumax concealed this information because Northern owed Alumax over $840,000 and Alumax did not want to jeopardize Congress's loan to Northern. Alumax denied that it knew Northern was in serious financial difficulty or that Congress ever asked it for such information, or that it had any obligation to inform Congress of its prior sales history with Northern. McGladrey and Hodroff each denied any accounting malpractice, negligence or fraud.

In May 1988, after extensive discovery, Alumax, McGladrey and Hodroff announced at a pre-trial conference that they had reached a *Pierringer*[2] settlement agreement. In October 1988 Alumax, McGladrey and Hodroff submitted the proposed settlement agreement to the district court for approval. Congress objected to the proposed settlement agreement on the grounds that Alumax was not required to indemnify McGladrey and Hodroff for Congress's cross-claims in exchange for the dismissal with prejudice of those cross-claims and the settlement was to have no collateral effect in any pending or subse-

quent actions commenced by Congress or any other party against McGladrey and Hodroff.

The district court approved the proposed settlement agreement. *Alumax Mill Products, Inc. v. Congress Financial Corp.*, No. 3–86–Civil–146, slip op. at 2. Under the terms of the settlement agreement, Hodroff and McGladrey each agreed to pay Alumax $125,000; Alumax's claims against Hodroff and McGladrey were dismissed with prejudice; the cross-claims of Congress and Congress–Midwest against Hodroff and McGladrey were dismissed with prejudice, subject to the proviso that the dismissal would not affect the rights of Congress and Congress–Midwest to have their liability, if any, to Alumax for damages reduced in accordance with *Frey v. Snelgrove*, 269 N.W.2d 918 (Minn.1978); the amount of any judgment in favor of Alumax and against Congress and Congress–Midwest would not be reduced by the amounts paid by Hodroff and McGladrey to Alumax pursuant to the settlement agreement; the cross-claims of Hodroff and McGladrey against Congress and Congress–Midwest were dismissed with prejudice; the cross-claims between Hodroff and McGladrey were dismissed with prejudice (Hodroff's third-party complaint against McGladrey and McGladrey's counterclaim against Hodroff); and any finding or determination of liability as to Hodroff and McGladrey in the case would have no collateral effect in any pending or subsequent actions commenced by Congress or Congress–Midwest or any other party.

This appeal by Congress and Congress–Midwest followed.

## STANDING TO OBJECT TO SETTLEMENT

■ We must address two threshold issues. First, we consider whether Congress has standing to object to the settlement agreement. In general, nonsettling defendants lack standing to object to a partial settlement. *See, e.g., Waller v. Financial Corp. of America*, 828 F.2d 579, 582 (9th Cir.1987); *cf. Armstrong v. Adams*, 869 F.2d 410, 414 (8th Cir.1989)

**2.** *Pierringer v. Hoger*, 21 Wis.2d 182, 124 N.W.2d 106 (1963).

(appellants who had been dismissed as defendants lack standing to object to settlement). "In ordinary litigation, that is, lawsuits between private parties, courts recognize that settlement of the dispute is solely in the hands of the parties." *Gardiner v. A.H. Robins Co.*, 747 F.2d 1180, 1189 (8th Cir.1984), *citing United States v. City of Miami*, 614 F.2d 1322, 1330 & n. 16 (5th Cir.1980) ("special situations" which require court approval include proposed class action settlements, proposed shareholder derivative suit settlements, proposed compromises of claims in bankruptcy court, and consent decrees in antitrust suits brought by United States), *modified on rehearing en banc*, 664 F.2d 435 (1981). "However, in multi-party lawsuits, non-settling defendants often seek the court's intervention to invalidate or alter partial settlements." *Quad/Graphics, Inc. v. Fass*, 724 F.2d 1230, 1232 (7th Cir.1983). "There is therefore a recognized exception to the general principle barring objections by non-settling defendants to permit a non-settling defendant to object where it can demonstrate that it will sustain some formal legal prejudice as a result of the settlement." *Waller v. Financial Corp. of America*, 828 F.2d at 583; *see Quad/Graphics, Inc. v. Fass*, 724 F.2d at 1232; *In re Beef Industry Antitrust Litigation*, 607 F.2d 167, 172 (5th Cir.1979) (citing 3 H. Newberg, Newberg on Class Actions § 5660b, at 564–65 (1977)), *cert. denied*, 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981); *cf. Armstrong v. Adams*, 869 F.2d at 414 ("plain legal prejudice" required to set aside voluntary dismissal under Fed.R.Civ.P. 41(a); drawing analogy between settlement and voluntary dismissal).

In the present case, as discussed further below, Congress argues that the proposed settlement, which dismissed with prejudice its cross-claims against Hodroff and McGladrey, stripped it of its indemnity and contribution rights. Courts have recognized that "a non-settling defendant has standing to object to a partial settlement which purports to strip it of a legal claim or cause of action, an action for indemnity or contribution for example." *Waller v. Financial Corp. of America*, 828 F.2d at

583 (citations omitted); *cf. Franklin v. Kaypro Corp.*, 884 F.2d 1222, 1223 (9th Cir.1989) (nonsettling defendants have standing to appeal), *petition for cert. filed*, 59 U.S.L.W. 3055 (U.S. July 9, 1990) (No. 90–98). We hold Congress has standing to object to the settlement and to appeal the district court's order approving it.

## SUBJECT MATTER JURISDICTION

We consider next another threshold issue, subject matter jurisdiction. "Federal subject matter jurisdiction may be raised at any time during litigation and must be raised *sua sponte* by a federal court when there is an indication that jurisdiction is lacking." *Hughes v. Patrolmen's Benevolent Ass'n of City of New York, Inc.*, 850 F.2d 876, 881 (2d Cir.), *cert. denied*, 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988). Unlike state courts, federal courts are courts of limited, not general, jurisdiction. *See, e.g., Bender v. Williamsport Area School District*, 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986). "For that reason, every federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review,' even though the parties are prepared to concede it." *Id., citing Mitchell v. Maurer*, 293 U.S. 237, 244, 55 S.Ct. 162, 165, 79 L.Ed. 338 (1934). Before oral argument, the court on its own motion questioned whether the district court had subject matter jurisdiction over Alumax's nonfederal claims against McGladrey. We asked the parties to file supplemental briefs and to address the nature of McGladrey's business organization, which, as discussed below, is critical for purposes of diversity jurisdiction, and, assuming no diversity jurisdiction, the effect, if any, of the Supreme Court's recent decision in *Finley v. United States*, 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989). We have considered the supplemental briefs and, for the reasons discussed below, hold that the district court lacked subject matter jurisdiction over Alumax's nonfederal claims against McGladrey.

As noted above, Alumax asserted both federal and state law claims against Con-

gress. The district court had subject matter jurisdiction over Alumax's RICO claim against Congress under 18 U.S.C. § 1964(a),[3] which provides in part that "[t]he district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 [listing prohibited racketeering activities] of this chapter by issuing appropriate orders." Because Alumax, Congress (and Congress–Midwest) and Hodroff are citizens of different states, the district court had diversity jurisdiction under 28 U.S.C. § 1332 over Alumax's nonfederal claims against Congress and Hodroff. The district court also had pendent claim jurisdiction over Alumax's nonfederal claims against Congress. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). The district court had ancillary jurisdiction over Congress's counterclaim against Alumax, the cross-claims, Hodroff's third-party complaint against McGladrey, and McGladrey's third-party counterclaim against Hodroff. *See Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 375 & n. 18, 98 S.Ct. 2396, 2403 & n. 18, 57 L.Ed.2d 274 (1978); *King Fisher Marine Service, Inc. v. 21st Phoenix Corp.*, 893 F.2d 1155, 1158–66 (10th Cir.) (traditional impleader within ancillary jurisdiction after *Finley v. United States*), cert. denied, —— U.S. ——, 110 S.Ct. 2603, 110 L.Ed.2d 283 (1990); *Fidelity & Deposit Co. v. C & A Currency Exchange, Inc.*, 738 F.Supp. 302 (N.D.Ill.1990) (impleader); *Huberman v. Duane Fellows, Inc.*, 725 F.Supp. 204, 205–07 (S.D.N.Y.1989) (impleader). *But cf. Community Coffee Co. v. M/S Kriti Amethyst*, 715 F.Supp. 772, 773–74 (E.D.La.1989) (questioning applicability of ancillary jurisdiction to third-party claims generally after *Finley v. United States*). What is in doubt is the basis for federal jurisdiction over Alumax's state law claims against McGladrey.

**3.** Title 18 U.S.C. § 1964(c) authorizes a private cause of action for injuries caused by racketeering activity.

**4.** In the context of this jurisdiction discussion, we refer to Alumax's state law claims against

*Diversity Jurisdiction*

 Because McGladrey is a partnership and has partners who are citizens of Illinois, Supplemental Brief for McGladrey at 1, federal jurisdiction over Alumax's state law claims against McGladrey cannot be based on diversity of citizenship. Corporations and unincorporated associations, including partnerships, are treated differently for purposes of diversity jurisdiction. *See generally* 13B C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure: Jurisdiction § 3630 (2d ed. 1984) (hereinafter Wright & Miller). Unlike corporations, the actual citizenship of each member of a partnership must be considered in determining whether diversity jurisdiction exists. *Id.* at 688–89; *see, e.g., Kauth v. Hartford Insurance Co.*, 852 F.2d 951, 959 (7th Cir.1988). Because McGladrey has Illinois partners, McGladrey is considered a citizen of Illinois for purposes of diversity jurisdiction. Alumax is a citizen of both Delaware and Illinois for purposes of diversity jurisdiction because it is a Delaware corporation and its principal place of business is in Illinois. 28 U.S.C. § 1332(c); *see, e.g., New Alaska Development Corp. v. Guetschow*, 869 F.2d 1298, 1300–01 (9th Cir.1989). McGladrey and Alumax are thus both citizens of Illinois. For this reason, complete diversity of citizenship is lacking and there is no diversity jurisdiction over these claims. *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. at 373 & n. 13, 98 S.Ct. at 2402 & n. 13; *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806); *Hiram Walker & Sons, Inc. v. Kirk Line*, 877 F.2d 1508, 1511 (11th Cir.1989).

 However, "the [complete diversity] rule of *Strawbridge v. Curtiss* does not require dismissal of claims against nondiverse defendants if [the] plaintiff has an independent basis of jurisdiction over them." 13B Wright & Miller § 3605, at 400 (footnote omitted). McGladrey argues Alumax's nonfederal[4] claims against it are

McGladrey for which there is no independent basis for federal jurisdiction as "nonfederal claims."

within either ancillary jurisdiction or pendent *claim* jurisdiction. Congress argues that there is no pendent *party* jurisdiction over McGladrey. Neither McGladrey nor Alumax confronts directly the question of pendent party jurisdiction. We now address these possible bases for federal jurisdiction.

*Ancillary Jurisdiction*

■ As a preliminary matter, we note that the doctrines of ancillary and pendent jurisdiction are distinct but closely related.

> Ancillary and pendent jurisdiction refer to the power of a federal court, once it acquires jurisdiction over a case and controversy properly before it, to adjudicate other claims sufficiently closely related to the main claim even though there is no independent basis for subject matter jurisdiction over the related claims.

*Baylis v. Marriott Corp.*, 843 F.2d 658, 663 (2d Cir.1988), *citing* 13 Wright & Miller §§ 3523, 3567. The Supreme Court has so far declined to determine whether there are any "principled" differences between the two related doctrines. *See Owen Equipment & Erection Co. v. Kroger*, 437 U.S. at 370 n. 8, 98 S.Ct. at 2401 n. 8; *Aldinger v. Howard*, 427 U.S. 1, 13, 96 S.Ct. 2413, 2419, 49 L.Ed.2d 276 (1976); *see generally* Miller, *Ancillary & Pendent Jurisdiction*, 26 S.Tex.L.J. 1, 1–2 (1985).

> Traditionally, ancillary jurisdiction refers to joinder, usually by a party other than the plaintiff, of additional claims and parties added after the plaintiff's claim has been filed. It is mainly a tool for defendants and third parties whose interests would be injured if their jurisdictionally insufficient claims could not be heard in an ongoing action in federal court.

*Baylis v. Marriott Corp.*, 843 F.2d at 663, *citing Owen Equipment & Erection Co. v. Kroger*, 437 U.S. at 376, 98 S.Ct. at 2404. Ancillary jurisdiction is usually implicated in cases that involve multi-party practice, such as compulsory counterclaims, cross-claims, intervention as of right, and third-party practice. *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. at 375 n. 18,

98 S.Ct. at 2403 n. 18 (citing cases); *see* Miller, *Ancillary & Pendent Jurisdiction*, 26 S.Tex.L.J. at 6–8.

McGladrey argues the district court had ancillary jurisdiction over Alumax's nonfederal claims against it because they involve impleader and arise out of the same "common nucleus of operative facts" as Alumax's federal RICO claim against Congress, that is, Northern's financial collapse. However, the Supreme Court in *Owen Equipment & Erection Co. v. Kroger* rejected ancillary jurisdiction in precisely this context. 437 U.S. at 376–77, 98 S.Ct. at 2404. In that case the original Iowa plaintiff sued for the wrongful death of her husband in an accident in which an electric power line came into contact with a steel crane. She sued the Nebraska power company in federal court under diversity jurisdiction. The power company filed a third-party claim against the crane owner. The plaintiff then amended her complaint to add a claim directly against the crane owner as an additional defendant. After the power company was granted summary judgment, only the crane owner remained as a party defendant. The plaintiff had alleged that the crane owner was a Nebraska citizen. However, it was discovered that, due to a change in the course of the Missouri River, the crane owner's principal place of business was located in Iowa, not Nebraska, and, thus, both the plaintiff and the crane owner were citizens of Iowa. The crane owner then moved to dismiss for lack of jurisdiction. The district court reserved decision on the motion, and the jury returned a verdict in favor of the plaintiff. The district court denied the motion to dismiss.

This court affirmed, holding that the district court had ancillary jurisdiction over the plaintiff's claim against the crane owner because that claim arose from the same "core of 'operative facts'" as both the plaintiff's initial claim against the power company and the power company's third-party claim against the crane owner. *Kroger v. Owen Equipment & Erection Co.*, 558 F.2d 417, 424 (8th Cir.1977), *citing United Mine Workers v. Gibbs*, 383 U.S. at 725, 86 S.Ct. at 1138. The Supreme Court

reversed. The Court noted that although a common nucleus of operative fact is the constitutional minimum for jurisdictional power, both "the posture in which the non-federal claim is asserted and ... the specific statute that confers jurisdiction over the federal claim" must also be examined. 437 U.S. at 373, 98 S:Ct. at 2402. The Court held that to extend ancillary jurisdiction to a state law claim by a plaintiff against a citizen of the same state as the plaintiff would circumvent the Congressional requirement of complete diversity. *Id.* at 377, 98 S.Ct. at 2404.

The alignment of the parties is the same in the present case as it was in *Owen Equipment & Erection Co. v. Kroger:* the plaintiff seeks to extend ancillary jurisdiction to a state law claim against a citizen of the same state. The result must be the same. The fact that Alumax's nonfederal claims against McGladrey, the third-party defendant and a citizen of the same state as Alumax, arise out of the same common nucleus of operative facts as the claims for which there are independent bases for federal jurisdiction cannot justify the extension of ancillary jurisdiction over a nonfederal claim against an additional, non-diverse defendant. "[M]ere factual similarity" between the nonfederal and the claims over which there is subject matter jurisdiction will not support ancillary jurisdiction if it would destroy complete diversity. *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. at 376, 98 S.Ct. at 2404. Thus, the district court did not have ancillary jurisdiction over Alumax's nonfederal claims against McGladrey.

*Pendent Claim Jurisdiction*

 McGladrey next argues the district court had pendent claim jurisdiction over Alumax's nonfederal claims against it. Pendent claims are state law claims which arise from the same "common nucleus of operative fact" as that of a substantial federal claim and which, if "considered without regard to their federal or state character, ... are such that [plaintiffs] would ordinarily be expected to try them all in one judicial proceeding." *United Mine Workers v. Gibbs,* 383 U.S. at 725, 86 S.Ct. at 1138; *see, e.g., Danner v. Himmelfarb,* 858 F.2d 515, 521 (9th Cir.1988) (citing *Blake v. Pallan,* 554 F.2d 947, 956–57 n. 11 (9th Cir.1977)), *cert. denied,* —— U.S. ——, 109 S.Ct. 2067, 104 L.Ed.2d 632 (1989); *640 Broadway Renaissance Co. v. Cuomo,* 714 F.Supp. 686, 689 (S.D.N.Y.1989). In a "classic" pendent jurisdiction case the plaintiff asserts two transactionally-related claims, one claim jurisdictionally sufficient and the other jurisdictionally insufficient, against a single defendant in one action. *See Owen Equipment & Erection Co. v. Kroger,* 437 U.S. at 370, 98 S.Ct. at 2400; Miller, *Ancillary & Pendent Jurisdiction,* 26 S.Tex.L.J. at 3. For example, in *United Mine Workers v. Gibbs* the plaintiff brought an action in federal court against a union, asserting parallel claims—a federal labor law claim and a state common law conspiracy claim. Diversity was absent. Each claim arose out of the same "common nucleus of operative fact," that is, alleged concerted union activity to deprive the plaintiff of his contractual and employment relationships with coal mine owners.

From the above description of pendent jurisdiction, it is apparent that there can be no pendent jurisdiction in the present case. Alumax has asserted only state law claims against McGladrey that are transactionally related to jurisdictionally sufficient claims it has asserted against *other* defendants. Alumax has not asserted a jurisdictionally sufficient claim against McGladrey. Without a jurisdictionally sufficient claim, that is, one that is independently cognizable in federal court, there is no claim to which the jurisdictionally insufficient claim can be "pendent" and thus no pendent claim jurisdiction. The district court did not have pendent claim jurisdiction over Alumax's nonfederal claims against McGladrey.

*Pendent Party Jurisdiction*

 The remaining possible jurisdictional basis for Alumax's nonfederal claims against McGladrey is pendent party jurisdiction. Pendent party jurisdiction is "jurisdiction over parties not named in any claim that is independently cognizable by the federal court." *Finley v. United States,* 109 S.Ct. at 2006 (footnote omitted).

It is a "hybrid of ancillary and pendent jurisdiction which does not neatly fit the traditional definition of either." *Baylis v. Marriott Corp.*, 843 F.2d at 664, *citing* 13B Wright & Miller § 3567.2. Although the federal claim and nonfederal claim arise out of the same common nucleus of operative fact and thus are transactionally related, the federal and nonfederal claims are not asserted against the same party, as is the case in pendent claim jurisdiction, but against different parties. *See* Miller, *Ancillary & Pendent Jurisdiction*, 26 S.Tex. L.J. at 11–13. Pendent party jurisdiction was generally available if (1) a substantial federal claim and the state claim or claims derived from a common nucleus of operative fact such that the plaintiff would ordinarily be expected to try them all in one judicial proceeding and (2) "Congress in the statutes conferring jurisdiction has not expressly or by implication negated its existence." *Aldinger v. Howard*, 427 U.S. at 18, 96 S.Ct. at 2422; *see, e.g., Zabkowicz v. West Bend Co.*, 789 F.2d 540, 546 (7th Cir.1986).

■ Pendent party jurisdiction must be assessed in light of *Finley v. United States.* In that case the plaintiff sued the United States in federal court under the Federal Tort Claims Act (FTCA) for the wrongful death of her husband and two of her children in an airplane crash at a city airfield. She alleged that the Federal Aviation Administration (FAA) was negligent in the operation and maintenance of the runway lights and in the performance of air traffic control. The basis of federal jurisdiction was the FTCA, 28 U.S.C. § 1346(b). The plaintiff later sought to add the city and the local electric company as defendants, alleging that their negligence had also caused the crash. There was no independent basis for federal jurisdiction over the city and the local electric company. The district court allowed the plaintiff to amend her complaint to add the city and the local electric company as "pendent parties." The Ninth Circuit reversed, holding that there was no pendent party jurisdiction under the FTCA.

The Supreme Court affirmed. The Court first distinguished pendent claim jurisdiction from pendent party jurisdiction, 109 S.Ct. at 2006–07, and then adopted a new, narrower "interpretative rule" for pendent party jurisdiction, *id.* at 2010. The Court held that pendent party jurisdiction exists only where Congress has *affirmatively granted* such jurisdiction. *Id.* at 2009; *e.g., Lather v. Beadle County*, 879 F.2d 365, 367 (8th Cir.1989) (FTCA); *cf. Lockard v. Missouri Pacific R.R.*, 894 F.2d 299, 301 (8th Cir.1990) (FELA); *Iron Workers Mid-South Pension Fund v. Terotechnology Corp.*, 891 F.2d 548, 551 (5th Cir.) (ERISA), *cert. denied,* — U.S. —, 110 S.Ct. 3272, 111 L.Ed.2d 782 (1990); *Ezell v. Burlington Northern R.R.*, 724 F.Supp. 863, 864–65 (D.Wyo.1989) (FELA); *see also* 13B Wright & Miller § 3567.2, at 25 (Supp. 1990). *But see Finley v. United States*, 109 S.Ct. at 2010 (Blackmun, J., dissenting) (*Aldinger v. Howard* assumes pendent party jurisdiction exists unless expressly or by implication negated by Congress); *id.* 109 S.Ct. at 2016–18 (Stevens, J., dissenting) (same).

The Court specifically noted that "a grant of jurisdiction over claims involving particular parties does not itself confer jurisdiction over additional claims by or against different parties." *Finley v. United States*, 109 S.Ct. at 2010. "This rule applies even where the claims against additional parties 'derive from a common nucleus of operative fact,' and are such that a plaintiff 'would ordinarily be expected to try them [all] in one judicial proceeding.'" *Lockard v. Missouri Pacific R.R.*, 894 F.2d at 302, *citing Finley v. United States*, 109 S.Ct. at 2006 (additional citation omitted). Thus, after *Finley v. United States*, unless Congress has affirmatively granted such jurisdiction, there is no pendent party jurisdiction. *See Lockard v. Missouri Pacific R.R.*, 894 F.2d at 301; *Staffer v. Bouchard Transportation Co.*, 878 F.2d 638, 643 n. 5 (2d Cir.1989) (questioning viability of pendent party jurisdiction after *Finley*); *compare Birkinshaw v. Armstrong World Industries, Inc.*, 715 F.Supp. 126, 127 (E.D. Pa.1989) (pendent party jurisdiction held not available in removal context after *Fin-*

*ley*), *with Carter v. Dixon,* 727 F.Supp. 478, 479–81 & n. 1 (N.D.Ill.1990) (pendent party jurisdiction held available in removal context after *Finley*); *see generally* 13B Wright & Miller § 3567.2, at 26 (Supp. 1990).

 In the present case, the federal statute in question is RICO. We have carefully examined the statute and its legislative history. Not surprisingly, the relevant statutory language does not refer to pendent party jurisdiction. Title 18 U.S.C. § 1964(a) states in part only that "[t]he district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter." Title 18 U.S.C. § 1964(c), which authorizes civil RICO claims, provides in part only that "person[s] injured in [their] business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States district court." The legislative history is silent. We think the fact that Congress did not consider the issue of pendent jurisdiction indicates that Congress did not intend to affirmatively grant pendent party jurisdiction under RICO. *Cf. Tafflin v. Levitt,* — U.S. ——, 110 S.Ct. 792, 796, 107 L.Ed.2d 887 (1990) (holding state courts have concurrent jurisdiction over civil RICO claims; legislative history contains no indication that Congress even considered question of concurrent jurisdiction, much less any suggestion that Congress affirmatively intended to confer exclusive jurisdiction over such claims on federal courts). We thus conclude that RICO does not authorize pendent party jurisdiction. *Cf. Palumbo v. I.M. Simon & Co.,* 701 F.Supp. 1407, 1413–14 (N.D.Ill.1988) (pre-*Finley*) ("nothing in the text or legislative history of RICO which indicates a Congressional intent to preclude [pendent party jurisdiction]"); *Nicolazzi v. Colombik,* 670 F.Supp. 823, 826 (N.D.Ill.1987) (same); *Charles Kurz Co. v. Lombardi,* 595 F.Supp. 373, 378 (E.D.Pa.1984) (same). *But cf. Armstrong v. Edelson,* 718 F.Supp. 1372, 1376–77 (N.D.Ill.1989) (pendent party jurisdiction granted under RICO; case arguably inconsistent with *Finley* rule).

We note that our holding that RICO does not authorize pendent party jurisdiction would not have required Alumax to bring separate state court and federal court proceedings. Unlike FTCA cases which may only be brought in federal court, civil RICO cases may be brought in state court or federal court. *See Tafflin v. Levitt,* 110 S.Ct. at 796. Thus, Alumax could have sued Congress, Congress–Midwest, Hodroff, and McGladrey in a single action in state court. *See Lockard v. Missouri Pacific R.R.,* 894 F.2d at 303 (FELA suits may be brought in state courts).

Accordingly, we vacate the order with respect to McGladrey only and remand the case to the district court with directions to dismiss Alumax's claims against McGladrey for lack of jurisdiction.

## SETTLEMENT AGREEMENT

 As a preliminary matter, we agree that Minnesota law is the applicable law. The settlement agreement resolved state law claims which were being litigated in federal court because of diversity or ancillary jurisdiction. The district court's interpretation of local law is entitled to great weight. Although we are not bound by the district court's interpretation of local law, we will not reverse unless we find that the district court has not correctly applied local law or unless its interpretation of local law "is fundamentally deficient in analysis or otherwise lacking in reasoned authority." *Ancom, Inc. v. E.R. Squibb & Sons, Inc.,* 658 F.2d 650, 654 (8th Cir.1981) (diversity); *see, e.g., Gillette Dairy, Inc. v. Mallard Manufacturing Corp.,* 707 F.2d 351, 353 (8th Cir.1983) (diversity); *cf. White Farm Equipment Co. v. Kupcho,* 792 F.2d 526, 529 & n. 4 (5th Cir.1986) (settlement agreement is contract and its validity is determined by reference to state substantive law governing contracts generally).

 The type of settlement agreement entered into between Alumax and Hodroff and McGladrey is commonly known as a *Pierringer* release after its approval by the Wisconsin Supreme Court in *Pierringer v. Hoger,* 21 Wis.2d 182, 124 N.W.2d 106 (1963). The Minnesota Supreme Court approved the *Pierringer* release in *Frey v.*

*Snelgrove,* 269 N.W.2d at 922. *See generally* Simonett, *Release of Joint Tortfeasors: Use of the* Pierringer *Release in Minnesota,* 3 Wm. Mitchell L.Rev. 1 (1977) (hereinafter Simonett). The basic elements of a *Pierringer* release are:

> (1) The release of the settling defendants from the action and the discharge of a part of the cause of action equal to that part attributable to the settling defendants' causal negligence; (2) the reservation of the remainder of plaintiff's causes of action against the nonsettling defendants; and (3) plaintiff's agreement to indemnify the settling defendants from any claims of contribution [or indemnity or both] made by the nonsettling parties and to satisfy any judgment obtained from the nonsettling defendants to the extent the settling defendants have been released.

*Frey v. Snelgrove,* 269 N.W.2d at 920 n. 1. *See also Austin v. Raymark Industries, Inc.,* 841 F.2d 1184, 1188–91 (1st Cir.1988) (discussing *Pierringer* release under Maine law); *Johnson v. Rogers,* 621 F.2d 300, 302–04 & n. 6 (8th Cir.1980) (*Pierringer* release in context of federal civil rights action; Minnesota law applied).

The district court in the present case followed the *Frey v. Snelgrove* analysis in dismissing all the claims and cross-claims against Hodroff and McGladrey, the settling defendants, and by reserving the rest of Alumax's claims against Congress, the nonsettling defendant. At 998. The district court order also provided that the settlement amounts paid by Hodroff and McGladrey cannot be deducted from any judgment in favor of Alumax against Congress. *Id.* at 999.[5] The district court order further provided that, because Hodroff and McGladrey were no longer parties as a result of the settlement agreement, any judgment in the present action would have no preclusive or evidentiary effect as to them. *Id.*

On appeal, Congress argues that the settlement agreement is not in fact a true *Pierringer* release because it did not include a promise by Alumax to indemnify the settling defendants, Hodroff and McGladrey,[6] from Congress's cross-claims for contribution or indemnification. Congress argues the settlement agreement as approved by the district court improperly cut off its contribution and indemnity rights, thus impairing its ability to shift all or part of its liability, if any, to the accountants. Congress specifically argues that the district court should not have dismissed its cross-claims for contribution and indemnification without requiring Alumax to agree to indemnify Hodroff and McGladrey or, alternatively, should have required Hodroff and McGladrey to remain in the case as parties for the limited purpose of defending against Congress's cross-claims for contribution or indemnification. *See Conkright v. Ballantyne of Omaha, Inc.,* 496 F.Supp. 147, 153 (W.D.Mich.1980); *Frey v. Snelgrove,* 269 N.W.2d at 923. Alumax, Hodroff and McGladrey argue the settlement agreement correctly dismissed Congress's cross-claims for contribution and indemnification against Hodroff and McGladrey because, under the terms of the *Pierringer* release, Congress's liability to Alumax is limited as a matter of law to its proportionate fault only. Hodroff and McGladrey also argue that Congress cannot cross-claim for indemnification because, under Minnesota law, the party seeking indemnification must be without personal fault.

In the present case the district court construed the settlement agreement as a *Pierringer* release and expressly approved it on that basis. " 'Crucial to the construction of the settlement agreement is the intent of the parties.' Intent is a question of fact." *Worthy v. McKesson Corp.,* 756 F.2d 1370, 1372 (8th Cir.1985) (per curiam)

---

5. *See, e.g., Johnson v. Rogers,* 621 F.2d 300, 303–04 (8th Cir.1980) (nonsettling party not entitled to have amount paid by settling party subtracted from damages nonsettling party is required to pay plaintiff); *Shantz v. Richview, Inc.,* 311 N.W.2d 155, 156 (Minn.1980); *Barlage*

*v. The Place, Inc.,* 277 N.W.2d 193, 196 (Minn. 1979); *Anunti v. Payette,* 268 N.W.2d 52, 56 (Minn.1978).

6. As discussed above, McGladrey is a third-party defendant.

(citation omitted). It is implicit in the district court order that the parties to the agreement, Alumax and Hodroff and McGladrey, understood the scope and effect of a *Pierringer* release and intended their settlement agreement to be a *Pierringer* release. We cannot say this finding of fact is clearly erroneous. The parties captioned the settlement agreement and referred to the document as a *Pierringer* release. "The language of the release and indemnity agreements themselves is the primary indicator of the parties' intent." *Austin v. Raymark Industries, Inc.,* 841 F.2d at 1191. Paragraph 7 of the settlement agreement contains the following language:

> Alumax hereby releases and forever discharges Congress and Midwest for that portion of its causes of action that shall hereafter be determined, at trial or other disposition, to be the fault of either [Hodroff], McGladrey or both. This Agreement is intended to be in the form of a *"Pierringer*-type release" and shall be construed in accordance with *Pierringer v. Hoger,* 21 Wis.2d 182, 124 N.W.2d 106 (1963), and *Frey v. Snelgrove,* 269 N.W.2d 918 (Minn.1978).

Paragraph 7 conclusively establishes that the parties intended the settlement agreement to be a *Pierringer* release.

Ordinarily, in the typical *Pierringer* release, the plaintiff agrees to indemnify the settling defendants against the nonsettling defendants' cross-claims and to satisfy any judgment obtained against the nonsettling defendants to the extent the settling defendants have been released. *See, e.g., Hoffman v. Wiltscheck,* 411 N.W.2d 923, 924 (Minn.Ct.App.1987); *Frey v. Snelgrove,* 269 N.W.2d at 922; *see generally* Simonett, 3 Wm. Mitchell L.Rev. at 8 & n. 33. In the present case, Alumax did not agree to indemnify Hodroff and McGladrey against Congress. Rather, Alumax, having already released Hodroff and McGladrey, agreed to release Congress, the nonsettling defendant, from any part of the judgment determined to be the fault of Hodroff and McGladrey, the settling defendants. Nonetheless, for the reasons discussed below, we think that the language in paragraph 7

is functionally equivalent to the requisite agreement by the plaintiff to indemnify the settling defendants against the cross-claims of the nonsettling defendants.

*Cross-claims for Contribution*

■ First, a *Pierringer* release cuts off the nonsettling defendant's cross-claims for *contribution* as a matter of law. "[A] *Pierringer* release operates to impute to the settling plaintiff whatever liability in contribution the settling defendant may have to nonsettling defendants and to bar subsequent contribution actions the nonsettling defendants might assert against the settling defendants." *Fleming v. Threshermen's Mutual Insurance Co.,* 131 Wis.2d 123, 388 N.W.2d 908, 911 (1986), *citing Pierringer v. Hoger,* 124 N.W.2d 106. This is because

> [t]he *Pierringer* release is based on the formula that each joint tortfeasor including the nonsettling defendant is liable only for that part of the award which is [its] percentage of causal negligence. Since the nonsettling defendant is relieved from paying more than [its] fair share of the verdict, the [settling] defendants may properly be dismissed from further participation in the trial.

*Frey v. Snelgrove,* 269 N.W.2d at 922; *see Peiffer v. Allstate Insurance Co.,* 51 Wis.2d 329, 355, 187 N.W.2d 182, 185 (1971) (no basis for contribution if *Pierringer* release). Because the jury then determines the relative fault of all parties, including that of the settling defendants, even though the settling defendants have been dismissed, *see Frey v. Snelgrove,* 269 N.W.2d at 923,

> [t]he settling tortfeasor who uses a *Pierringer* release does not settle for less than [its] share, but precisely for [its] share—no less.
>
> ... [T]he non-settling party will never pay more than [its] share, because [its] exposure is limited to [its] own percentage of causal negligence—exactly [its] share—attributed to [it] at trial.

Simonett, 3 Wm. Mitchell L.Rev. at 18 (footnote omitted). Thus, *"Pierringer* means that the amount collected from a

nonsettling defendant will represent the full award offset by the amount equivalent to the percentage of liability allocated to the settling defendants." *Austin v. Raymark Industries, Inc.*, 841 F.2d at 1189.

Because the legal effect of the *Pierringer* release is that each tortfeasor pays only its proportionate share of liability, and no more, there can be no liability for contribution. *See Diggs v. Hood*, 772 F.2d 190, 195–97 (5th Cir.1985); *Leger v. Drilling Well Control, Inc.*, 592 F.2d 1246, 1249–51 (5th Cir.1979); *Bordelon v. Consolidated Georex Geophysics*, 628 F.Supp. 810, 811–13 (W.D.La.1986). For this reason, once the district court approved the settlement agreement, Congress's cross-claims for contribution had no legal effect and the district court correctly dismissed them.

*Cross-claims for Indemnification*

 Next, we think a *Pierringer* release can also be applied to cross-claims for *indemnification*. In *Frey v. Snelgrove*, the Minnesota Supreme Court recognized that a *Pierringer* release could settle indemnity as well as contribution cross-claims. 269 N.W.2d at 922. The court noted that "[i]f a nonsettling party has cross-claims for both contribution and indemnity, either of which is not covered by the terms of the release, then the settling defendant should continue as a party for the limited purpose of defending against the surviving cross-claim." *Id.* at 923. The Wisconsin Supreme Court, the court that originally developed the *Pierringer* release doctrine, has expressly held that *Pierringer* principles apply to actions for indemnification as well as actions for contribution. *Fleming v. Threshermen's Mutual Insurance Co.*, 131 Wis.2d 123, 388 N.W.2d at 911, *citing Gauerke v. Rozga*, 112 Wis.2d 271, 332 N.W.2d 804, 810 (1983) (operation of *Pierringer* release not affected by distinction between contribution and indemnification).

The Minnesota Court of Appeals has similarly held that a *Pierringer* release in which the plaintiff agreed to indemnify the agent barred any recovery by the plaintiff from the principal. *Hoffman v. Wiltscheck*, 411 N.W.2d at 925–27 (indemnifica-

tion; vicarious liability). The court reasoned that because the principal has a right of indemnification from its agent for any damages the principal pays to the plaintiff, "any right [the plaintiff] can establish to recover damages from [the principal] is offset by [the plaintiff's] obligation to repay the same damages." *Id.* at 926 (footnote omitted). *See also Bogatzki v. Hoffman*, 430 N.W.2d 841, 843 (Minn.Ct.App.1988) (indemnification; scope of release in dispute). Under these circumstances, "there is no point in going through the circuity of ordering a judgment" against the nonsettling defendant only to have the plaintiff ultimately satisfy the judgment itself. *See Fleming v. Threshermen's Mutual Insurance Co.*, 388 N.W.2d at 911 (nonsettling defendant is liable to plaintiff, but also entitled to indemnity from the settling defendant, who, in turn, the plaintiff agreed to indemnify in *Pierringer* release), *citing Pierringer v. Hoger*, 124 N.W.2d at 112; *see generally* Simonett, 3 Wm. Mitchell L.Rev. at 24 (plaintiff bars itself from collecting any money from a nonsettling defendant who successfully establishes a right to indemnity against a settling defendant).

Moreover, the application of *Pierringer* principles to cross-claims for indemnification is consistent with the "comparative indemnity" adopted by the Minnesota Supreme Court in *Tolbert v. Gerber Industries, Inc.*, 255 N.W.2d 362, 367–68 (Minn. 1977). *Accord Dole v. Dow Chemical Co.*, 30 N.Y.2d 143, 331 N.Y.S.2d 382, 282 N.E.2d 288 (1972); *Pachowitz v. Milwaukee & Suburban Transport Corp.*, 56 Wis.2d 383, 202 N.W.2d 268 (1972); *see generally* Simonett, 3 Wm. Mitchell L.Rev. at 25. In *Tolbert v. Gerber Industries, Inc.*, the court reviewed its prior decisions concerning indemnity between joint tortfeasors and identified five indemnity situations: (1) derivative or vicarious liability, (2) liability due to justifiable reliance upon another, (3) liability due to breach of duty owed by another, (4) liability due to failure to discover or prevent the misconduct of another, and (5) contractual liability. 255 N.W.2d at 366, *citing Hendrickson v. Minnesota Power & Light Co.*, 258 Minn.

368, 372, 104 N.W.2d 843, 848 (1960). The court distinguished contractual indemnity cases and then noted that, in the first three situations, the party seeking indemnity is without personal fault but nevertheless is liable, and indemnity shifts the liability to the wrongdoer. 255 N.W.2d at 366. The court contrasted those situations with the fourth situation in which the party seeking indemnity is at fault but nonetheless seeks indemnification from another wrongdoer to avoid responsibility for the damage it has caused. *Id.* at 367.[7] The court noted that, in that situation, the then-current rule awarded indemnity on an all-or-nothing basis, which the court characterized as too much of a "blunt instrument for reallocating responsibility for damages." *Id.* (footnote omitted). Instead, the court drew an analogy to the "related area" of contributory negligence and adopted a "relative fault" approach for indemnification under which "the more culpable tortfeasor will continue to bear a greater share of the loss, but at the same time [the less culpable] joint tortfeasor will not continue to escape all liability as in the past." *Id.* As noted by Justice Simonett, "[t]he *Pierringer* release is designed to work in this very situation [that is, relative or comparative fault]." Simonett, 3 Wm. Mitchell L.Rev. at 25.

Having decided that the *Pierringer* release can be applied to cross-claims for indemnification, we must determine the scope of this settlement agreement. Congress argues that under the release Alumax agreed to release Congress only from liability for that portion of its cause of action determined to be the "fault" of Hodroff or McGladrey, or both, and that "fault" means negligence only. Because Alumax has not released Congress from liability for fraud committed by Hodroff or McGladrey, Congress argues the district court should not have dismissed its cross-claims for indemnification against Hodroff and McGladrey.

The district court implicitly construed the release as an agreement by Alumax to assume the portion of liability attributable to Hodroff and McGladrey, whether due to negligence or fraud, because it dismissed Congress's cross-claims for indemnification. Assuming for purposes of analysis that Congress's cross-claims for indemnification alleged fraud as well as negligence, a point which Alumax disputes, we think the district court's interpretation of the scope of the release is supported by the language used in the settlement agreement. Paragraph 4 of the settlement agreement provides that

> Alumax ... releases and forever discharges [Hodroff] and McGladrey ... from any and all claims, liabilities, demands, damages, rights, actions or causes of action, ... which Alumax has, or may have, against [Hodroff] and McGladrey, or either of them, including, without limitation, all claims brought by Alumax against [Hodroff] and McGladrey in the Alumax suit.

As noted above, Alumax had charged Hodroff and McGladrey each with negligence and fraud. For this reason, we agree that the term "fault" as it is used in paragraph 7 of the settlement agreement includes both negligence and fraud committed by Hodroff and McGladrey. Alumax has agreed, in substance, to indemnify Hodroff and McGladrey against Congress. The *Pierringer* release operates, as a matter of law, to impute to Alumax any liability Hodroff and McGladrey may have to indemnify Congress. *See Fleming v. Threshermen's Mutual Insurance Co.*, 388 N.W.2d at 911; *Hoffman v. Wiltscheck*, 411 N.W.2d at 926. Thus, under the settlement agreement, Congress is liable for only its own proportionate share of damages and no longer needs the protection of its cross-claims for indemnification. We hold the district court correctly dismissed Congress's cross-claims for indemnification.

*Preclusive Effect*

 Congress also argues that the district court should not have approved the

---

7. Contrary to the arguments of Hodroff and McGladrey, in this situation, both parties are at fault and indemnity "shifts the entire loss from one culpable wrongdoer to another." *See Tolbert v. Gerber Indus., Inc.*, 255 N.W.2d 362, 366–67 (Minn.1977).

settlement agreement because it improperly protects only Hodroff and McGladrey from any preclusive effect. We disagree. Because the present case, which constitutes the "prior litigation" for preclusion purposes, is being litigated in federal court, we apply federal preclusion rules. *See generally* Restatement 2d of Judgments § 87 (1982); 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4466 (1981). Federal courts generally do not apply collateral estoppel, or issue preclusion, between parties who were codefendants in the prior action. *See generally* 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4450 (1981 & Supp.1990) (issue preclusion exception for co-parties). Because co-parties are usually not adversaries in fact, the prior action is not considered the "actual, full, and fair litigation" necessary to apply collateral estoppel. *See Franklin Stainless Corp. v. Marlo Transport Corp.*, 748 F.2d 865, 867 (4th Cir.1984) (codefendants; 1 defendant had been dismissed); *Hall v. Bleisch*, 400 F.2d 896, 896–97 (5th Cir.1968) (per curiam) (codefendants; case settled), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 864, 21 L.Ed.2d 775 (1969). *Accord Denzer v. Frisch*, 430 N.W.2d 471, 472–75 (Minn.Ct.App.1988) (settling defendant in prior action sued nonsettling defendants; settling defendant held not collaterally estopped from relitigating issue of nonsettling defendants' alleged negligence). The district court did not err in providing that the settlement agreement would not have any preclusive effect on Hodroff and McGladrey.

In sum, we hold that the district court did not abuse its discretion in approving the settlement agreement and in dismissing Congress's cross-claims for contribution and indemnification.

Accordingly, we affirm in part, vacate in part and remand the case to the district court with directions to dismiss Alumax's claims against McGladrey for lack of jurisdiction.